No. 45,992

State of Kansas, *Appellee,* v. Raymond L. Darling, *Appellant.*

(493 P. 2d 216)

470

Opinion filed January 22, 1972.

*Russell Shultz*, of Wichita, argued the cause, and *Leonard F. Watkins, Jr.*, of El Dorado, was with him on the brief for the appellant.

*David P. Calvert*, Deputy County Attorney, argued the cause, and *Vern Miller*, Attorney General, and *Keith Sanborn*, County Attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal in a criminal action by the defendant from a conviction in the district court of Sedgwick County, Kansas, of the crime of procuring an abortion or miscarriage in violation of K. S. A. 21-437.

Trial errors are asserted for reversal on appeal.

On March 3, 1969, Adelheid M. Jackson had reason to believe she was pregnant and consulted Dr. George B. Howell. Dr. Howell determined that Mrs. Jackson was six to eight weeks pregnant and was in good general health. Dr. Howell testified there was no evidence that an abortion was required to preserve the life of Mrs. Jackson.

On March 10, 1969, Mrs. Jackson, in the company of a Mr. Marion E. Berry, went to El Dorado and called the telephone number of a person she believed to be a doctor, which had been supplied to her by a friend. As a result of the ensuing conversation a meeting was arranged at Mr. Berry's home at 418 New York, Wichita, Sedgwick County, Kansas. The appointment was kept

at 10:30 a. m. on the 11th day of March by the defendant, a once, but not then, licensed chiropractor.

Mr. Darling entered the residence, introduced himself, and asked Mrs. Jackson if she wanted to go through with the abortion. She replied in the affirmative. After the price of $400 was agreed upon, Mr. Darling returned to his car and came back with his equipment, an electronic machine.

Thereupon Mrs. Jackson lay down on the bed and Mr. Darling set up his machine. He caused two leads from the machine to be placed in contact with Mrs. Jackson. A needle-like lead was inserted in her body, and a pad connected to the other lead was placed on her abdomen. He then set the machine and told her to turn it up herself as high as she could take it. After a period of time elapsed the defendant turned down the machine and removed the leads from Mrs. Jackson's body. While the machine was on she had a reaction, the operation of the machine caused her pain.

Mr. Darling then instructed Mrs. Jackson to obtain some castor oil and pills mikrin (phonetically) to help loosen the fetus. She did obtain these and take them under defendant's instructions. The defendant left as soon as Mr. Berry had paid him the $400.

That night and the next day Mrs. Jackson took the castor oil and pills as directed. She also took some tranquilizers (which she had previously obtained from a Dr. Clark at St. Francis Hospital) and some aspirin for the pain.

On the 12th day of March, 1969, she began to react to the overdose of drugs and was then taken to the emergency room at St. Francis Hospital in Wichita. There she was treated for the overdose by Dr. Daniels. Dr. Daniels also examined and photographed what he termed electrical burns on Mrs. Jackson's abdomen. In Dr. Daniel's expert opinion the electrical burns and a watery substance indicated an impending abortion caused by a diathermic machine.

After three days, Dr. Clark released Mrs. Jackson from St. Francis Hospital as there was nothing he could do.

On the 18th day of March, 1969, Mrs. Jackson was miscarrying and returned to the hospital under Dr. Howell's care. She remained in the hospital four days during which time she had an operation commonly termed a "D and C," and blood transfusions.

The appellant was charged with violation of K. S. A. 21-437 in that he did on the 11th day of March, 1969, unlawfully and will-

fully administer and employ on a pregnant woman, Adelheid M. Jackson, a metallic instrument and an electronic device, with the intent in him to procure the abortion or miscarriage of Mrs. Jackson, the same not having been necessary to preserve her life.

The trial court overruled a number of motions asserted by the appellant in the trial of the action to challenge the sufficiency of the evidence to prove the elements of the crime charged.

The appellant argues the evidence is conclusive that he did not administer any drugs, medicine or substance to Mrs. Jackson; that according to her testimony she procured the pills from Dr. Clark and obtained the castor oil herself; and that she took both the pills and the castor oil herself. The appellant argues if Mrs. Jackson were believed, the most he did was to tell her that it would assist in getting the fetus loose, and this, it is contended, would not amount to administering drugs or medicine. It is the appellant's theory that the crime here charged is a misdemeanor and that there is no such thing as an accessory principal in a misdemeanor case; that any evidence which could sustain a conviction must be evidence that the appellant was actually involved with overt acts in the crime charged, citing K. S. A. 21-105 and 21-106.

The appellant's theory is that if he did any act which could support his conviction it must be based upon his activity with the machine. It is argued since there is no accessory principal in a misdemeanor case the mere fact that the machine was his or that he brought it to the house where it was used, without more, would not be sufficient to establish that he employed or used an instrument upon Mrs. Jackson.

We fail to see merit in the appellant's argument. The facts heretofore related clearly put the appellant within the requirement of the law that he administer drugs or use an instrument on a pregnant woman to cause an abortion. Here the electronic device was set up by the appellant, placed in position and operated strictly under his supervision and in accordance with his directions. While the precise point concerning the medicine and drugs has not been touched upon in our cases, other states with similar laws have held that prescribing drugs is administering them for purposes of the statute.

In *Estep v. State*, 183 Tenn. 325, 192 S. W. 2d 706, the Supreme Court of Tennessee held that where the defendant, a naturopathic physician, who professionally prescribed toxic drugs was guilty of

"administering" such drugs in violation of a statute defining a misdemeanor.

In *Seifert v. State,* 160 Ind. 464, 67 N. E. 100, the defendant procured an instrument for a woman, and advised and directed her to use it upon herself to produce a criminal abortion. The woman pursuant to such advice and directions used such instrument for such purpose in the absence of the defendant, thereby causing her to miscarry and die. In the opinion the court said:

"Assuming, without deciding, that it was not the purpose of the legislature, in the enactment of § 1857 Burns 1901, entirely to blot out the distinction between principals and accessories, we think that it may still be affirmed that appellant was properly charged as a principal. While the principal in the commission of a felony must be actually or constructively present at the time of its commission (1 Bishop, Crim. Law (8th ed.), § 648; McClain, Crim. Law, § 204), yet a person who causes such a crime to be committed through an innocent agent is deemed constructively present. McClain, Crim. Law, §§ 187, 207; 1 Bishop Crim. Law (8th ed.), §§ 648, 651; *Commonwealth v. Hill,* 11 Mass. 136; *Gregory v. State,* 26 Ohio St. 510, 20 Am. Rep. 774. This fiction of the constructive presence of the real instigator and promoter of the crime is indulged in a case where an innocent agent commits the act, because there would otherwise be no principal. This being the reason for the doctrine, it is evident that the test as to whether the former is a principal or an accessory does not depend upon whether the agent is morally innocent, but upon whether he is criminally responsible for the particular crime charged. As said by Mr. Bishop: 'Since there must always be a principal, one is such who does the criminal thing through an innocent agent while personally absent. For example, when a dose of poison, or an animate object like a human being, with or without general accountability, but not criminal in the particular instance, inflicts death or other injury in the absence of him whose will set the force in motion, there being no one but the latter whom the law can punish, it of necessity fixes upon him as the doer.' 1 Bishop, Crim. Law (8th ed.), § 651." (pp. 465, 466.)

We regard the foregoing law to be persuasive. Here the appellant was present while the electronic device was being used and he was the doer of the unlawful acts.

The evidence was sufficient to show a causal relation between the application of the electronic device to Mrs. Jackson and the administration of drugs to her by the appellant and the resultant abortion to sustain a conviction.

The appellant contends there was no evidence that the abortion was not necessary to save the life of the mother.

It is essential for the state to allege in the information and to negative the exception stated in the statute. That is, the intent to procure an abortion would not be a criminal offense if it were

necessary to preserve the life of such woman. In *State v. Jamieson*, 206 Kan. 491, 480 P. 2d 87, the court held in Syllabus ¶ 3:

"An information attempting to charge the offense of abortion as defined by K. S. A. 21-437 is examined and found to be fatally defective for failure to negative the exception— 'unless the same shall have been necessary to preserve the life of such women.'"

Dr. Howell testified he had examined Mrs. Jackson on March 3, 1969, and found no evidence, in his professional opinion, that an abortion was indicated in this case to preserve the life of the patient. This evidence is clearly sufficient to sustain a finding by the jury that the abortion was not necessary to preserve the life of the mother.

Frederick E. Strum testified he was an investigator for the state of Kansas and assigned to the State Board of Healing Arts; that he was acquainted with the appellant and on the 16th day of October, 1967, personally served revocation papers on Dr. Darling, revoking his license as a chiropractor. His license was revoked because the appellant had previously been convicted of performing an illegal abortion. The appellant's objection to this testimony was overruled.

This evidence showed the appellant was not qualified as a medical doctor to make a determination concerning the necessity for the abortion.

The evidence presented by the state was sufficient to prove all elements of the crime charged. Therefore, the trial court did not err in overruling the appellant's motion for discharge, and other motions lodged by the appellant to test the sufficiency of the evidence were properly overruled.

On appeal from conviction in a criminal action, the testimony is to be viewed in the light most favorable to the state, and the verdict will not be disturbed if there was substantial evidence upon which the jury could have based its verdict. (*State v. Davis*, 106 Kan. 527, 188 Pac. 231; and *State v. Thomas*, 155 Kan. 374, 125 P. 2d 375.)

The appellant next specifies that the trial court erred in giving instruction No. 7 which reads:

"A person is presumed to intend the natural and probable consequence of his voluntary and deliberate act, and if the commission of an unlawful act is proved, it will be presumed that such act was done with criminal intent.

"This presumption of law will always prevail unless, after a consideration of all the evidence bearing upon the point, you have a reasonable doubt of the existence of such intent."

The appellant objected to this instruction on the ground that it was inflammatory and prejudicial and that the evidence failed to show the subsequent medical complications were a natural and probable consequence of any voluntary act of the appellant.

On appeal the appellant argues the instruction shifts the burden of proof—an entirely different objection.

Issues not raised or determined in the trial court will not be considered on appeal. (*Williams v. Crouse,* 193 Kan. 526, 394 P. 2d 96; *State v. Baker,* 197 Kan. 660, 421 P. 2d 16; and *Mize v. State,* 199 Kan. 666, 433 P. 2d 397.)

The foregoing instruction was approved in *State v. Sweetin,* 134 Kan. 663, 8 P. 2d 397; and *State v. Hathaway,* 143 Kan. 605, 56 P. 2d 89, and authorities cited in these decisions.

The appellant next contends the trial court erred in refusing to permit him to propound certain questions to the veniremen upon *voir dire* examination.

At the time the appellant propounded questions to one of the jurymen the trial court had already *sustained the appellant's objection* to the state's *voir dire* question: "Okay. Have you formed an opinion as to whether an abortion is morally right or morally wrong?"

Now the appellant, in what purports to be an inconsistent position, contends the trial court erred in refusing to permit his counsel to question the veniremen as to whether or not they had "any moral scruples or any moral compunction" concerning abortions, and "whether or not [any were] members of any organization favoring abortions."

On numerous occasions this court has commented on the trial court's discretionary power in relation to *voir dire* examinations. In *Mathena v. Burchett,* 189 Kan. 350, 369 P. 2d 487, this court said:

". . . The examination is conducted under the supervision and direction of the trial court, and the nature and extent of the examination and what questions may or may not be answered must necessarily be left largely to the sound discretion of the trial court, the exercise of which will not be interfered with unless clearly abused. . . ." (p. 355.)

(See, also, *Bartlett v. Heersche,* 204 Kan. 392, 400, 462 P. 2d 763; and *Swift v. Platte,* 68 Kan. 1, 72 Pac. 271, opinion on rehearing 68 Kan. 10, 74 Pac. 635.)

In 47 Am. Jur. 2d, § 195, it is said:

". . . It has been said that the ultimate function of voir dire is to explore the nuances of conscience to determine whether a prospective juror is able to

participate fairly in the deliberations on the issue of guilt, confining his judgment to the facts as presented, and that the overall purpose of voir dire examination of jurors is to determine the real state of their minds so that a fair and impartial jury can be chosen. . . ." (p. 786.)

In 47 Am. Jur. 2d, § 201, it is said:

"An examination of a prospective juror on his voir dire is proper so long as it is conducted strictly within the right to discover the state of mind of the juror with respect to the matter in hand or any collateral matter reasonably liable to unduly influence him, and questions which go primarily to the ascertainment of any probable bias or ground of incompetency, as a basis of a challenge for cause, or possibly of a peremptory challenge, are permissible. . . ." (p. 790.)

In 47 Am. Jur. 2d, § 202, it is said:

"Most authorities take the position that the defendant in a criminal prosecution is entitled to make reasonable and pertinent inquiries of a juror on his vior dire, so that he may exercise intelligently and wisely his right of peremptory challenge. . . ." (p. 792.)

The moral attitude of the veniremen as to the desirability or undesirability of abortions is immaterial. However, an attempt by counsel for the defendant in a criminal action to discover if there is any bias or prejudice against one charged with abortion on the jury panel should not be unduly restricted.

While the trial court perhaps should have granted the appellant more leniency in this respect, on the record presented we cannot say the court abused the exercise of its power of discretion in limiting the inquiry by the appellant. Here all veniremen were questioned on whether they had any preconceived ideas of what an abortion law should be like, or whether they would have any difficulty applying the law as given to them by the judge. All of the jurors answered these questions in the negative. Whether or not a juror can consider the case on the law as it exists without bias or prejudice is the material point here under attack.

Considering the record on *voir dire* examination we cannot say the appellant was prejudiced by the trial court in curtailing *voir dire* examination of the jurors.

The appellant contends the trial court erred in restricting the cross-examination of Mrs. Jackson, the primary witness for the state in this case.

Counsel for the appellant attempted to propound questions to Mrs. Jackson concerning the circumstances of her pregnancy. An attempt was made to determine who the putative father was and the marital status of Mrs. Jackson.

On direct examination Mrs. Jackson testified she was pregnant at the time the alleged acts were committed. Obviously an illegal abortion cannot be committed unless the woman is pregnant, and the state was required to prove this fact as an element of the crime. The appellant takes the position that such testimony by Mrs. Jackson on direct examination opened the question for inquiry on cross-examination as to the circumstances which led to her pregnancy, contending the appellant was entitled to fully develop the issue. The appellant further contends the questions were designed to ascertain whether or not there was any bias or prejudice on the part of the witness.

We think the circumstances of the pregnancy and the witness' background are clearly not elements of the crime, and objections to that line of questioning on cross-examination were properly sustained.

Whether it was proper to attack the credibility of the witness is controlled by K. S. A. 60-422 (c). Here the appellant intended to inquire into the premarital sexual relations and the illegitimacy of the aborted child in order to attack the witness' credibility. Counsel clearly intended to go into her background to show her character traits which it was felt would impinge on her credibility and attack her veracity.

Under 60-422 (c), *supra,* evidence of traits of character other than honesty or veracity or their opposites, shall be inadmissible. Sexual immorality has nothing to do with the veracity of a witness and is clearly one of the subjects of inquiry prohibited by the statute.

In *Craft v. State,* 3 Kan. 450, it was said the fact that the state's chief witness was a prostitute does not mean that she will not tell the truth. The court in *State, ex rel., v. Lyons,* 107 Kan. 312, 191 Pac. 281, held in a bastardy case that loss of virtue does not imply a lack of truthfulness.

Undoubtedly the theory expressed in 60-422 (c), *supra,* is that juries should not be allowed to be swayed by inflammatory evidence that a person has undesirable character traits such as sexual immorality, when these traits have no effect on the veracity of the witness. The right to a fair trial does not include the right to an unfair advantage by introducing irrelevant evidence that may inflame a juror against the witness.

The trial court did not err in its refusal to permit the appellant

to cross-examine Mrs. Jackson on the circumstances of her pregnancy.

The appellant specifies as error the admission of state's exhibits 3 and 4 into evidence. These were copies of two informations and two journal entries disclosing two prior convictions of the appellant for illegal abortions in the district court of Butler County, Kansas.

This specification was argued by the appellant on his motion for a new trial in the trial court, but has not been briefed on appeal. It must therefore be deemed to have been abandoned. Error in the trial court is never presumed on appeal, and the appellant has the burden to establish affirmatively that error has been committed. (*Jocich v. Greyhound Cab Co.,* 188 Kan. 268, 362 P. 2d 27; *American Fence Co. v. Gestes,* 190 Kan. 393, 375 P. 2d 775; and *Blackburn v. Colvin,* 191 Kan. 239, 380 P. 2d 432.)

Lastly the appellant contends it was error to admit evidence concerning the revocation by the State Board of Healing Arts of his license to practice chiropractic through the testimony of Frederick E. Strum.

This evidence was relevant to show lack of mistake and knowledge on the part of the appellant in holding himself out as a doctor to Mrs. Jackson. (K. S. A. 60-455.)

The record discloses substantial evidence that Adelheid M. Jackson believed the appellant to be a doctor. She testified that through a friend she "found out a doctor where I can contact for an abortion." When asked why she contacted him she answered:

"A. Because I was told he is a doctor and he will do it the right way. That is why I contacted him. I didn't know it was—

"Q. He could do what the right way?

"A. Put the baby away and all this.

"Q. What do you mean by 'put the baby away'?

"A. I mean abort the baby and I was thinking he's a doctor and that is why I told him about the infection, too, and I was thinking he could clear it up."

The evidence showed knowledge on the part of the appellant that he was not a medical doctor. It was competent to show there was no way the appellant could have in good faith held himself out to be a doctor.

In conclusion, the appellant has failed to show he was prejudiced by any of the rulings, concerning which complaint is made, in the trial of this action.

The judgment of the lower court is affirmed.